In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-02-201 CV


____________________



RALPH KENNETH ROYER, Appellant



V.



DEBORAH KOWN ROYER, Appellee






On Appeal from the 9th District Court


Montgomery County, Texas


Trial Cause No. 95-11-04612-CV






OPINION


 This is an appeal from the denial of a motion to modify the amount of child support
ordered to be paid by appellant (petitioner below), Ralph Kenneth Royer. The trial court
conducted a hearing at which both Mr. Royer and appellee, Deborah Kown Royer,
testified. Various documents reflecting the financial status of the parties were also
introduced into evidence for the trial court's consideration. Mr. Royer raises a single
appellate issue, viz: "Did the trial court abuse [its] discretion in denying a modification of
child support?" 

 We review a trial court's decision to deny, or grant, a motion to modify a child
support order for an abuse of discretion. See Worford v. Stamper, 801 S.W.2d 108, 109
(Tex. 1990); Nordstrom v. Nordstrom, 965 S.W.2d 575, 577-78 (Tex. App.--Houston [1st
Dist.] 1997, pet. denied). The test for abuse of discretion is whether the court acted
arbitrarily or unreasonably, that is without reference to guiding rules and principles. Id.
at 578. In making this determination, we must view the evidence in the light most
favorable to the actions of the trial court and indulge every legal presumption in favor of
the judgment. Id. We must uphold the trial court's decision as long as there is some
evidence of a substantive and probative character to support its decision. Id. 

 A trial court may modify a prior child support order if "the circumstances of the
child or a person affected by the order have materially and substantially changed since the
date of the order's rendition." Tex. Fam. Code Ann. § 156.401(a)(1) (Vernon 2002). 
In determining whether there has been a material and substantial change in circumstances,
it is well settled that the trial court must compare the financial circumstances of the
children and the affected parties at the time the existing support order was entered with
their circumstances at the time the modification is sought. See Farish v. Farish, 921
S.W.2d 538, 541 (Tex. App.--Beaumont 1996, no writ); Tucker v. Tucker, 908 S.W.2d
530, 532 (Tex. App.--San Antonio 1995, writ denied); Penick v. Penick, 780 S.W.2d 407,
408 (Tex. App.--Texarkana 1989, writ denied). Nevertheless, it is the best interest of the
child that is always the trial court's primary consideration when it determines questions of
child support. Tucker, 908 S.W.2d at 532-33. Therefore, the trial court retains broad
discretion in making the equitable decision of whether to modify a prior support order. 
Lindsey v. Lindsey, 965 S.W.2d 589, 593 (Tex. App.--El Paso 1998, no pet.). 

 In his brief, Mr. Royer directs our attention almost exclusively to his income tax
returns for the years 1996 and 2001. Mr. Royer seems to base his appellate argument on
the simple fact that his income for 1996, the year of the divorce, was significantly greater
than his income for 2001, the year he filed the motion to modify. We decline to accept
this narrow view of the evidence a trial court may consider in determining whether a
material and substantial change has occurred and what is in the best interest of the child. 
The financial ability of Mr. Royer to pay child support does not depend solely on current
earnings, but extends to all sources that might be available. See Clark v. Jamison, 874
S.W.2d 312, 317 (Tex. App.--Houston [14th Dist.] 1994, no writ); Musick v. Musick, 590
S.W.2d 582, 586 (Tex. Civ. App.--Tyler 1979, no writ). Furthermore, it is proper for the
trial court to take into consideration the value of a party's property, even though it is not
producing income, because the party may be required to dispose of assets in order to meet
his support obligations. See Penick, 780 S.W.2d at 410; Labowitz v. Labowitz, 542
S.W.2d 922, 926 (Tex. Civ. App.--Dallas 1976, no writ). 

 The evidence before the trial court, taken in the light most favorable to its ruling,
indicated that Mr. Royer's income was essentially based upon what he chose to pay himself
from his business. Furthermore, while Mr. Royer testified at one point that he did not
receive a salary, at another point in the hearing his direct examination testimony indicated
the following: 

 Q.[Mr. Royer's Counsel] In fact, in 1999, your personal income was what?


 A.[Mr. Royer] 178,509 dollars.


 Q. That's just the employment or wages that your business made; is that
correct?


 A. That's correct. 


 Q. Your Sub S income, you also made an additional amount; is that correct?


 A. That's correct.


 Q. How much was that?


 A. For Sub S, 137,961 dollars.


 Q. In 1999, you made over 300,000 dollars?


 A. That's correct. 


 During cross-examination of Mr. Royer, Mrs. Royer's trial counsel introduced
Respondent's Exhibit 2, a summary of Mr. Royer's federal income tax returns for the
years 1991 through 2001. The figures are set out as follows:

 Year Adjusted Gross Income

 1991 $123,362

 1992 $270,445

 1993 $406,356

 1994 $558,448

 1995 $353,707

 1996 $ 95,452

 1997 $ 41,573

 1998 $135,515

 1999 $325,695

 2000 $ 70,453

 2001 $ 35,239


 As Respondent's Exhibit 2 also indicated, over the past eleven years, Mr. Royer's
adjusted gross income averaged out to be $219,658 per year, and since 1996, the year of
the divorce, his adjusted gross income averaged out to be $121,695 per year. Mr. Royer's
testimony characterized his income as having "dropped pretty dramatically since 1996." 
This was apparently due to the fact that his business, Lifestyle Sports, Inc., lost three of
its top accounts: Nike Swimwear - - lost in the first quarter of 2000; Starter Corporation -
- lost sometime in 1999; and Anwand - - lost in 1998. Yet, in the midst of this seemingly
drastic downturn in his personal income since 1996, Mr. Royer purchased a new home in
February 2000, for approximately $530,000, with approximately $385,000 still owing. 

 The confusion was evident on the part of the trial judge as he began questioning Mr.
Royer regarding the timing of the purchase of the new house: 

 THE COURT: When did you buy this house?


 [Mr. Royer]: 2000, February of 2000.


 THE COURT: If your business was in trouble and you said it's been
going downhill for several years, why would you obligate yourself on a
350,000 dollar, almost half a million dollar house when you don't have the
money to pay for it?


 [Mr. Royer]: Your Honor, when I made the commitment, the prior
year before I started having the home built, I made 178,000 dollars, was my
income, and based on that, I could afford to make that decision. I wasn't
aware at the time that one of the companies I represented was going to file
bankruptcy and another one was going to make the decision to bring its sales
force in-house, internally; otherwise, had I known that, I wouldn't have
made that decision.


 THE COURT: What year did you say that was?


 [Mr. Royer]: That what was, Your Honor?


 THE COURT: That you made 174,000 dollars?


 [Mr. Royer]: I believe it was 1998.


 THE COURT: So in 1998, you made 174,000 dollars and you built
the house in the year 2000. What did you make in '99?


 [Mr. Royer]: Your Honor, I could be wrong. Sometimes I guess the
years. The 178,000 could have been in '99, and I believe the prior year I
made 116,000 dollars.


 Regardless of what year he began building the new house, it is clear from Mr.
Royer's previous testimony that by February of 2000, he had lost two of the three major
accounts (Starter and Anwand) and even possibly Nike Swim as that was lost in the "first
quarter" of 2000. The record before us appears to indicate that while Mr. Royer's
business lost three major accounts, he continued to make significant discretionary
expenditures in his personal life. For example, Respondent's Exhibit 3 lists dues payments
to the Woodlands Country Club from October 27, 2000, through December 29, 2001. 
These payments averaged $212.02 per month. Respondent's Exhibit 4 lists Mr. Royer's
liquor expenses dating from January 28, 2000, through December 11, 2001. This
averaged out to $312.63 per month. Respondent's Exhibit 5 indicates that Mr. Royer's
pool and yard maintenance expenses for the period from September 10, 2000, through
December 29, 2001, averaged $190.65 per month. Most telling are the expenses reflected
in Respondent's Exhibit 8 which includes the amounts Mr. Royer spent in furnishing his
new house. The earliest date listed in this exhibit is February 17, 2000, and the final date
listed is January 3, 2002. The total amount spent for furnishings during this roughly two-year period which Mr. Royer previously testified was very bad financially for both himself
and his business is listed as $28,732.66. 

 Additionally, testimony of Mr. Royer indicated that in January of 2001, he
purchased a fur for his wife from Sakowitz for $4,319. Lastly, we cannot ignore the fact
that Mr. Royer, as the sole shareholder in Lifestyle Sports, Inc., was free from time to
time to take "draws" from the business for his own personal use. It should also be noted
that Mr. Royer personally and solely decided when to "fund" his personal pension plan, 
and at the time of trial his pension fund totaled approximately $380,000. 

 Although Mr. Royer's earned income at the time of the original support order in
1996 was higher than his listed income at the time of the filing of the motion to modify,
considering his overall financial resources and assets, we find that the trial court did not
abuse its discretion in maintaining the child support at the amount reflected in the divorce
decree. Mr. Royer simply failed to carry his burden of proof that a material and
substantial change in circumstances had occurred so as to justify a reduction in his monthly
child support obligation. Mr. Royer's appellate issue is overruled. The trial court's denial
of the motion to modify is affirmed. 

 AFFIRMED. 


 PER CURIAM



Submitted on January 2, 2003

Opinion Delivered January 23, 2003


Before McKeithen, C.J., Burgess and Gaultney, JJ.